**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

STEPHEN WAYNE MURPHY,
            *Defendant-Appellant.*

No. 06-30582

D.C. No.
CR-04-30057-ALA

OPINION

Appeal from the United States District Court
for the District of Oregon
Ann L. Aiken, District Judge, Presiding

Argued and Submitted
July 12, 2007—Portland, Oregon

Filed February 20, 2008

Before: Alfred T. Goodwin, Stephen Reinhardt, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Reinhardt

**COUNSEL**

Vance M. Waliser, Medford, Oregon, for the defendant-appellant.

Karin J. Immergut, United States Attorney, District of Oregon, Judith R. Harper, Special Assistant United States Attorney, Medford, Oregon, for the plaintiff-appellee.

## OPINION

REINHARDT, Circuit Judge:

Defendant Murphy appeals the district court's denial of his motion to suppress evidence seized as a result of two searches. We conclude that one search was lawful and one was not. The first search, a protective sweep of storage units following Murphy's arrest, was justified by the officer's legitimate concern about the potential presence of confederates in the area. We conclude that the district court's ruling as to this search was correct. The second search occurred two hours later, after Murphy, who was residing in the units temporarily, had refused to consent but the officers subsequently obtained consent from the individual who rented the storage units. In light of the Supreme Court's recent decision in *Georgia v. Randolph*, 547 U.S. 103 (2006), we reverse the district court's denial of the suppression motion as to this search.

I.

On August 4, 2004, officers from the Jackson County Narcotics Enforcement Team followed two individuals, Cozo and Wyman, who were observed purchasing precursor ingredients used to manufacture methamphetamine, to a storage facility. The officers knew that defendant Murphy was staying in storage units rented by Dennis Roper at this facility. They intercepted Wyman as he was driving away from the facility and he told them that Cozo was still inside unit 17. The officers waited outside until Cozo left the unit. Officer Thompson then knocked on the door and Murphy opened it holding a ten-inch piece of metal pipe. Thompson recognized Murphy and knew him to be a methamphetamine manufacturer. Thompson asked Murphy to drop the pipe, but he did not initially comply. Thompson then stepped to the right and asked again; this time Murphy dropped the pipe. From his position, Thompson was able to observe in plain view an operating methamphetamine lab inside the storage unit. As a result, he arrested Murphy.

Murphy refused to give his consent to a search of the units, so Thompson performed a short protective sweep of units 17 and 18. Murphy was transported to jail and Thompson left the scene to prepare an affidavit for a search warrant.

Later that afternoon, Roper arrived at the scene and police arrested him on outstanding warrants. Roper claimed that he had no knowledge of the methamphetamine lab but that he had given Murphy permission to reside at the facility. He then consented in writing to a search of the units. The officers seized the methamphetamine lab as a result of this search.

Murphy challenged the protective sweep and the validity of Roper's consent to the subsequent search of the units. The district court denied his motion to suppress and Murphy entered a conditional plea of guilty, reserving his right to appeal the denial of the motion. In March 2006, the Supreme Court held in *Georgia v. Randolph*, 547 U.S. 103 (2006), that a warrantless entry and search is invalid when one occupant refuses permission to search even though another occupant with authority consents. *Id.* at 122-23. Murphy filed a motion to reconsider in light of *Randolph*, which the district court denied. Murphy was sentenced to 120 months imprisonment. He now appeals the district court's denial of his motion to suppress the evidence seized in the storage unit.

II.

[1] Both of the searches that Murphy challenges were conducted without a warrant. Warrantless searches are unconstitutional unless the government demonstrates that they "fall within certain established and well-defined exceptions to the warrant clause." *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1298 (9th Cir. 1988) (quoting *United States v. Perdomo*, 800 F.2d 916, 918 (9th Cir. 1986)).

[2] One exception to the warrant clause is a protective sweep. A valid protective sweep must be supported by " 'spe-

cific and articulable facts supporting [the] belief that other dangerous persons may be in the building or elsewhere on the premises.' " *Id.* (quoting *United States v. Whitten*, 706 F.2d 1000, 1014 (9th Cir. 1983)). The district court held that the protective sweep was valid because "defendant was holding a metal pipe." Murphy argues that this is not enough to justify a protective sweep, and we agree. The purpose of a protective sweep is to protect law enforcement officers from attack by dangerous confederates. *See Maryland v. Buie*, 494 U.S. 325, 333-34 (1990). Thus, the government must articulate facts that could have led the officer to the conclusion that there might be another person hiding inside the storage unit. The fact that Murphy opened the door holding a metal pipe is irrelevant to that question. Thus, the district court erred in upholding the protective sweep for the reason that it did. We may, however, affirm the district court's decision on any ground supported by the record. *See Atel Fin. Corp. v. Quaker Coal Co.,* 321 F.3d 924, 926 (9th Cir. 2003) (citing *Cigna Prop. & Cas. Ins. Co. v. Polaris Pictures Corp.*, 159 F.3d 412, 418 (9th Cir. 1998)).

**[3]** Although we do not believe that the district court's rationale for upholding the protective sweep was valid, we conclude that there is evidence in the record to support the search. Officer Thompson testified that he conducted the protective sweep because Roper, who he knew rented the storage unit, and for whom there was an outstanding arrest warrant, was not accounted for at the time. He testified that he was "looking for a body to make sure there was [sic] no other people in there." Because Thompson was aware of the possibility that Roper might be inside the storage unit and limited his protective sweep to the immediate area, we conclude that the government has met its burden of demonstrating that the sweep was valid.[1]

---

[1] It is not apparent from the record whether any evidence was seized during the protective sweep. We do not consider here the validity of any such seizure. We consider only the validity of the protective sweep itself.

III.

The second search was conducted after Murphy had refused to consent to a search, and had been arrested and removed from the scene. Officers then obtained consent from Roper two hours after Murphy had expressly refused to grant his.

**[4]** The district court incorrectly held that because the officer had already viewed the methamphetamine lab in plain view during the protective sweep, the subsequent search was lawful. First, the plain view doctrine is not an exception to the warrant requirement. We have recognized that "even [when] contraband plainly can be seen and identified from outside the premises, a warrantless entry into those premises to seize the contraband would not be justified absent exigent circumstances." *G & G Jewelry, Inc. v. City of Oakland*, 989 F.2d 1093, 1101 (9th Cir. 1993); *see also Horton v. California*, 496 U.S. 128, 137 & n.7 (1990). Second, a warrantless search of the premises, such as a protective sweep, must be " 'strictly circumscribed by the exigencies which justify its initiation.' " *Mincey v. Arizona*, 437 U.S. 385, 393 (1978) (quoting *Terry v. Ohio*, 392 U.S. 1, 25-26 (1968)). Under *Mincey*, once the exigencies of the initial entry have dissipated, the police must obtain a warrant for any further search of the premises. *Id.* at 392-93. Thus, as soon as Thompson completed his protective sweep of the storage unit and departed, the exigency that justified that warrantless search ended. Neither the government nor the district court cites any further exigency that would have justified the second search two hours after the protective sweep was completed. Presumably, even the officer understood that he could not conduct further searches or seizures in the storage unit because he left the scene to obtain a warrant. The district court erred in relying on the plain view doctrine to justify a warrantless search when exigent circumstances did not exist.

**[5]** The government contends further that the second search was independently justified by Roper's grant of his voluntary

consent.[2] Murphy argues, however, that under *Georgia v. Randolph*, 547 U.S. 103 (2006), Roper's consent to the second search did not overcome his earlier objection to it. In *Randolph*, police were called to a residence after a domestic dispute. *Id.* at 107. There, Mrs. Randolph told the officer that her husband was a drug user and that there was evidence to support her accusation in the house. *Id.* The officer asked Mr. Randolph for permission to search the house and he refused. *Id*. However, Mrs. Randolph consented to a search of the residence and the officer entered and seized evidence of Mr. Randolph's drug use. *Id.* The Supreme Court held that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." *Id.* at 120.

The government attempts to distinguish the present case from *Randolph* in two ways. First, *Randolph* involved co-tenants of a residence who both clearly had the authority to consent or refuse to consent to a search. This case involves a storage unit, which Murphy did not own or pay rent for and thus, the government contends, he did not have the authority to agree or object to a search. Second, in *Randolph* both the consenting tenant and the refusing tenant were present at the scene and gave contemporaneous conflicting responses to the officers, whereas Murphy refused to consent before he was arrested and removed from the scene, and Roper consented two hours later when Murphy was no longer present. Because we conclude that neither distinction is legally meaningful and that the rationale in *Randolph* applies to the facts of this case, we hold that the second search violated Murphy's Fourth

---

[2]Roper did not reside in the units but he stored his business equipment in them and entered and left at will. Thus, Roper is in between a landlord, who may not consent to a search, *see Chapman v. United States*, 365 U.S. 610, 616-17 (1961), and a co-tenant, who may. We will assume for the purposes of this opinion, however, that he has the same rights as a co-tenant.

Amendment rights, even though both Roper and Murphy had the authority to grant or withhold consent.

**[6]** It is well established that a person with common authority over property can consent to a search of that property without the permission of the other persons with whom he shares that authority. *See Illinois v. Rodriguez*, 497 U.S. 177 (1990)*; United States v. Matlock*, 415 U.S. 164 (1974). Common authority "does not rest upon the law of property, with its attendant historical and legal refinements." *Matlock*, 415 U.S. at 172 n. 7. Rather, it is established through "mutual use of the property by persons generally having joint access or control for most purposes." *Id.* For example, the Supreme Court has found that two people sharing a duffel bag have common authority over the bag and one of them may consent to a search of the bag — even if the evidence sought or seized implicates the other in a crime. *See Frazier v. Cupp*, 394 U.S. 731, 740 (1969). By contrast, an individual lacks common authority and may not consent to a search if that person occasionally spends the night at an apartment but does not entertain guests there, does not spend time in the apartment when the actual occupant is not present, does not contribute to the rent, and does not, to the knowledge of the occupant, possess a key. *Rodriquez*, 497 U.S. at 181 (finding the search legitimate because even though the person who stayed in the apartment occasionally did not have actual authority, the police reasonably believed that she did).

**[7]** Despite some testimony to the contrary, we conclude that the evidence presented at the suppression hearing supports the district court's determination that Murphy exercised sufficient control over the storage units to possess the authority to grant or withhold consent to a search of them. In short, the district court held that Murphy had an expectation of privacy in the storage units, and we agree. At the hearing, Roper testified that he allowed Murphy to stay in the storage units beginning in early June and gave him a key that opened all of the units. He also testified that he asked Murphy to leave in

early July and requested that he return the key at that time. At the time of the arrest, however, Roper told the officer who arrested him that he allowed Murphy to stay in the unit, but, the district court found, did not tell him that he had asked Murphy to leave. Murphy, too, testified that Roper did not ask him to leave and that Roper had in fact visited him at the storage unit on the evening preceding the events in question, thus indicating his tacit consent to Murphy's continued presence. Given all of this contradictory evidence, the district court's ruling that Roper's testimony that he asked Murphy to leave lacked credibility was not clearly erroneous. Accordingly, we find no basis for reversing the district court's determination that Murphy lived in unit 14 with Roper's permission.

Moreover, although the district court was less certain about the issue of unit 17, Murphy stored personal belongings in that unit — the unit in which the majority of the evidence that supports the underlying conviction was found. Testimony at the hearing revealed that the officers found Murphy's personal belongings in unit 17, including his personal papers, as well as a cordless phone whose base was located in unit 14. Additionally, it is clear that Murphy stored the materials and equipment that were seized and formed the basis of his conviction in unit 17. He also invited guests into the unit, which the officers observed when they followed the individuals who bought methamphetamine precursor ingredients to the storage facility. Possession of a key, storage of personal belongings, and the ability to entertain guests are all factors that establish Murphy's common authority over unit 17. They reflect that Murphy enjoyed "joint access or control for most purposes." *Matlock*, 415 U.S. at 171 n.7; *see also Rodriguez*, 497 U.S. at 181-82.

**[8]** Nevertheless, the government argues that Murphy did not have the authority to object to the search because he did not pay rent. There is no requirement in *Randolph*, or the cases that preceded it, that an occupant pay rent in order to possess the authority to object to a search of property in

which he resides, temporarily or otherwise. Quite the opposite. The *Randolph* Court acknowledged the "multiplicity of living arrangements" that people have, but stated that such variance does not mean that "the rule to be applied to them is similarly varied." *Randolph*, 547 U.S. at 109 n.2. Additionally, *Randolph* reiterated the long-established understanding that common authority for the purposes of the Fourth Amendment is not equivalent to technical property rights. *Id.* at 110. Indeed, "[t]he common authority that counts under the Fourth Amendment may thus be broader than the rights accorded by property law." *Id.* (citing *Rodriguez*, 497 U.S. at 181-82). The important question is not who possesses a property right, but rather what are the dictates of "widely shared social expectations." *Id.* at 111. As explained above, Murphy was living in one unit and kept his personal belongings in another, and thus had a legitimate expectation of privacy in both units, regardless of whether he paid rent. The Supreme Court has held that "overnight houseguests have a legitimate expectation of privacy in their temporary quarters because 'it is unlikely that [the host] will admit someone who wants to see or meet with the guest over the objection of the guest.' " *Id.* at 113 (quoting *Minnesota v. Olson*, 495 U.S. 91, 99 (1990)). By definition house guests do not pay rent, and yet they have the authority to refuse consent to a search. It is apparent, therefore, that Roper's temporary residence in the units entitled him to exercise common authority over his living quarters.[3]

**[9]** Relatedly, the government argues that Roper's consent trumped Murphy's refusal because Roper had greater authority over the premises since he paid the rent and stored his medical equipment there. Again, although there may be a basis in property law for this argument, "neither state-law property rights, nor common contractual arrangements" govern the protection of the Fourth Amendment. *Id.* at 112.

---

[3]We note, incidentally, that even if the payment of rent were a requirement, Murphy would qualify because his arrangement with Roper, that he would work in exchange for staying in the storage unit, would suffice.

According to the *Randolph* Court, "[u]nless the people living together fall within some recognized hierarchy, like a household of parent and child or barracks housing military personnel of different grades, there is no societal understanding of superior and inferior." *Id.* at 114. There is no basis for the government's contention that the validity of consent or refusal to search hinges on ownership or level of authority over the property.

**[10]** Next, the government argues that *Randolph* does not apply because the storage unit was not a residence. As an initial matter, Murphy's living situation was unconventional, but the record shows that the storage units were the closest thing that he had to a residence. He was sleeping in unit 14 and storing his belongings in unit 17. For the purposes of the Fourth Amendment, this is sufficient to create an expectation of privacy and thus the authority to refuse a search. Moreover, even if the storage units could not be considered a residence, there is no reason that the rule in *Randolph* should be limited to residences. *Randolph* is rooted in the idea of common authority and the Supreme Court has extended the principle of common authority well beyond residences. In *Frazier v. Cupp*, 394 U.S. 731 (1969), the Court held that the shared use of a duffel bag was enough to give rise to common authority between users such that either user could give lawful consent to a search. *Id.* at 740. Certainly, business offices are also subject to the protection of the Fourth Amendment. *See Mancusi v. DeForte*, 392 U.S. 364, 369 (1968). Thus, we hold that Murphy had common authority over the storage units and could legitimately consent or refuse to give consent to a search of those units.

**[11]** The second major distinction that the government attempts to make between this case and *Randolph* is that in the former, unlike in the latter, the objecting co-tenant was not physically present when the other tenant gave consent to the search. Here, Murphy refused consent and was subsequently arrested and removed from the scene. Two hours later, offi-

cers located Roper and obtained consent from him to search the units. Roper did not know that Murphy had previously refused consent and Murphy was not present to object once again to the second search. We see no reason, however, why Murphy's arrest should vitiate the objection he had already registered to the search. We hold that when a co-tenant objects to a search and another party with common authority subsequently gives consent to that search in the absence of the first co-tenant the search is invalid as to the objecting co-tenant.

**[12]** We find support for our holding in the *Randolph* Court's treatment of the related issue of police removal of a tenant from the scene for the purpose of *preventing* him from objecting to a search. 547 U.S. at 121. The Court held that third party consent to a search is valid only "[s]o long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection." *Id.* If the police cannot prevent a co-tenant from objecting to a search through arrest, surely they cannot arrest a co-tenant and then seek to ignore an objection he has already made. Nor, more generally, do we see any reason to limit the *Randolph* rule to an objecting tenant's removal by police. Once a co-tenant has registered his objection, his refusal to grant consent remains effective barring some objective manifestation that he has changed his position and no longer objects. The rule that *Randolph* establishes is that when one co-tenant objects and the other consents, a valid search may occur only with respect to the consenting tenant. It is true that the consent of either co-tenant may be sufficient in the absence of an objection by the other, either because he simply fails to object or because he is not present to do so. Nevertheless, when an objection has been made by either tenant prior to the officers' entry, the search is not valid as to him and no evidence seized may be used against him.[4]

---

[4]Refusing to grant consent and objecting to the search are one and the same for Fourth Amendment purposes. The terms are used interchangeably throughout this opinion, as they are in *Randolph*.

Rather, as in this case, in the absence of exigent circumstances, the police must obtain a warrant before conducting the search.

## IV.

For the foregoing reasons, we hold that the first search was a valid protective sweep. We do not rule, however, on the validity of the seizure of any evidence obtained during that search. We further hold that the second search violated Murphy's Fourth Amendment rights and we reverse the district court's ruling regarding the evidence seized as a result of that search. The decision of the district court is therefore

**AFFIRMED** in part and **REVERSED** in part.