**Darryl O. MARTIN, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 06–CM–1001.

District of Columbia Court of Appeals.

Argued Dec. 14, 2007.
Decided July 10, 2008.

Joel R. Davidson for appellant.

Heather A. Hill, Assistant United States Attorney, for appellee. Jeffrey A. Taylor, United States Attorney, and Roy W. McLeese III, Lisa H. Schertler, Anne Y. Park, and Stephanie L. Brooker, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, BLACKBURNE–RIGSBY, Associate Judge, and FARRELL, Associate Judge, Retired.[*]

WASHINGTON, Chief Judge:

Appellant Darryl Martin was charged with carrying a dangerous weapon[1] and possession of an unregistered firearm.[2] Before trial, appellant moved to suppress the admission of physical evidence (a firearm) recovered from his home. Following the trial court's denial of the motion, appellant entered a conditional guilty plea to the charge of possession of an unregistered firearm, reserving his right to appeal the trial court's denial of his motion to suppress. Super. Ct.Crim. R. 11(a)(2). On appeal, appellant contends that the trial court erred in concluding that the police did not conduct a search. We agree and reverse.

## I.

### *Factual Background*

On April 20, 2006, Metropolitan Police Department (MPD) Officer Lenox Antoine

---

[*] Judge Farrell was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on July 1, 2008.

1. In violation of D.C.Code § 22–4505(a) (2001).

2. In violation of D.C.Code § 7–2502.01(a) (2001).

responded to a radio assignment for a burglary at 312 Quackenbos Street, N.E. While en route, he received an update that shots had been reported fired. Upon arriving, Officer Antoine spoke with appellant, who stood outside the home. Appellant informed the officer that while he was standing in his mother's kitchen, he witnessed a man trying to break into an abandoned house across the street. Then, he heard a noise coming from the basement of his house. Appellant went to inspect the basement, when a man with a sledgehammer opened an exterior door to the basement. Upon seeing appellant, the man fled. Appellant chased him.

After hearing this information, Officer Antoine called detectives to the scene. Detective Collis Timlick arrived and learned from other officers on the scene that witnesses had seen appellant fire a shotgun outside the house before running back inside. Detective Timlick questioned appellant about this allegation, but appellant denied it. The detective then asked appellant for consent to search his house. Appellant refused. Detective Timlick then informed appellant that they would have to secure the premises until they received a search warrant. Then, either appellant or MPD called his mother, Eula Martin. Within fifteen to twenty minutes, Ms. Martin arrived at the scene. Detective Timlick informed Ms. Martin that witnesses re-

ported seeing appellant fire the gun in the air. She then invited the officers to come inside.

Once inside the home, Detective Timlick informed Ms. Martin that the police would either have to get a search warrant to search her home, which would permit them to search the entire house for the shotgun, or she could assist them "by doing a consent to search and sign a form." [3] Appellant was present for this conversation and did not interject or object. Ms. Martin signed the authorization form.[4] Then, either Ms. Martin told her son to go get the gun or appellant went of his own accord; regardless, appellant went to a coat closet and retrieved the gun. It is undisputed that the police did not order him to do so. MPD officers arrested appellant.

### Motion to Suppress Hearing

Appellant moved pretrial to suppress the shotgun, asserting that "[t]he police *entered the defendants' [sic] home* without a warrant," and that although the mother consented to a search, "the defendant was present denying the authority." [5] At the hearing, the government presented testimony from Officer Antoine, Detective Timlick, and a crime scene technician. On cross-examination, Detective Timlick admitted that appellant denied "consent to search the house." The defense called Ms.

3. Detective Timlick recalled: "What I told the mother, I said, ma'am, if we have to get a search warrant, then we have to search the whole house. I don't want to put you in that situation where we have to search the whole house for the shotgun. I told her, I said the witnesses stated they saw your son bring the shotgun in. I said we have a consent to search form that you can sign. And we can get the shotgun and leave the scene. But if you don't give us the shotgun and we have to get an emergency search warrant, then we have to search the whole house. And that's not what I'm here for to make you a victim...."

4. Ms. Martin confirmed that the police did not threaten to damage her house. But her testimony suggests that she may mistakenly believed that her signature on the form acknowledged that the police *would not* search the home if Martin turned over the shotgun.

5. Appellant also moved to suppress certain statements he made to the police prior to his arrest. Appellant has not appealed the trial court's decision regarding those statements.

Martin. Ms. Martin confirmed that she invited the police into her home, that she signed the consent form, that appellant retrieved the gun from the closet, and that MPD did not order him to do so. She did not recall, however, the police ever mentioning a warrant. Ms. Martin acknowledged that she read the consent form and signed it.

The trial court considered Detective Timlick's testimony more persuasive than Ms. Martin's, as she had difficulty explaining what she thought when she signed the form. The court, however, noted that regardless of whose testimony it credited, it found that no search had occurred: "They didn't search the house. There's no search of this house. There wasn't a single search conducted."

## II.

Appellant contends that the trial court erred in concluding that the police officers did not conduct a search of his home by mistakenly relying on his mother's consent as well as his assistance to the police in conducting the search once they were already inside the home. We agree.

■■■ The Fourth Amendment protects against "unreasonable searches and seizures." U.S. CONST. amend. IV. "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984).[6] An individual has a clear expectation of privacy in the home. Indeed, " '[i]t is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth

Amendment is directed.' " *Oliver v. United States*, 656 A.2d 1159, 1164 (D.C.1995) (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 748, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984)) (internal quotation omitted).

The Fourth Amendment draws a line at the threshold to the home, beyond which the police or government agents may not cross absent a warrant, subject only to a few well-prescribed exceptions. *See Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). In *Payton*, the Supreme Court clarified that this protection is violated even in cases where the police have probable cause to arrest an individual they know (or have reason to believe) is inside his home. *Id.* *Payton* involved two separate incidents; yet, in both, police made warrantless entries into the dwellings of the subjects to arrest them. 445 U.S. at 576–78, 100 S.Ct. 1371. The Court concluded that neither consent nor exigent circumstances excused the warrantless entries. 445 U.S. at 590, 100 S.Ct. 1371. The New York Court of Appeals had upheld the entries, however, by distinguishing between warrantless entries for the purpose of arresting a felon and warrantless entries to search for evidence. 445 U.S. at 589, 100 S.Ct. 1371. The New York appellate court viewed the former as being less intrusive, as the latter would likely include a broader search area. *Id.* The Supreme Court, however, rejected this distinction and reaffirmed the sanctity of the home: "[T]he critical point is that any differences in the intrusiveness of entries to search and entries to arrest are merely ones of degree rather than kind. The two intrusions share this fundamental

6. This protection applies only to governmental action; "it is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the government or with the participation or knowledge of any governmental

official.' " *Jacobsen, supra*, 466 U.S. at 113–14, 104 S.Ct. 1652,(quoting *Walter v. United States*, 447 U.S. 649, 662, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980) (Blackmun, J., dissenting)).

characteristic: *the breach of the entrance to an individual's home.*" 445 U.S. at 589, 100 S.Ct. 1371 (emphasis added). Noting that the "zone of privacy [is no] more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home," the Court concluded that "[i]n terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house." 445 U.S. at 589–90, 100 S.Ct. 1371. "Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." 445 U.S. at 590, 100 S.Ct. 1371; *see also Welsh, supra,* 466 U.S. at 754, 104 S.Ct. 2091,(holding that the Fourth Amendment clearly prohibited the police from a warrantless entry into petitioner's home to arrest him, based in part on the assumption that no valid consent to enter was given).

■ Our decisions also make it clear that the threshold of one's home may not be crossed without a warrant unless an exception to the warrant requirement applies. One such exception occurs when parties voluntarily consent to such an intrusion. *See Robertson v. United States,* 429 A.2d 192, 194 (D.C.1981). In *Robertson,* police officers arrived at appellant's home, entered, and arrested him in connection with a robbery. *Id.* While the officers had probable cause to arrest Robertson for the robbery, they did not have a warrant to enter his home to effectuate the arrest. *Id.* at 193–94. Robertson argued, citing *Payton,* that his constitutional rights had been violated by the police because they entered his home and arrested him without a warrant. *Id.* at 194. This court agreed with Robertson that unless some exception to the warrant requirement was applicable, his arrest was improper because the police entered his home without a warrant. Ultimately, the court upheld the conviction, however, because it concluded that Robertson had invited the police inside his home:

> [I]t is clear from the record that when the officers approached the door to appellant's house[,] they were invited in by appellant. There is no indication that appellant's invitation was the result of police coercion or undue influence. Thus the officers' entry into the dwelling was on the basis of appellant's consent voluntarily given....[W]e hold that the officer's entry into the dwelling of appellant was not in violation of the Fourth Amendment.

*Id.* These cases set out clear Fourth Amendment guidelines—the police may not enter an individual's home without a warrant unless they can meet one of the well-defined exceptions to the warrant requirement, such as consent or exigent circumstances.[7]

---

7. In another case, this court concluded that *no search* had taken place where a police officer had been invited inside the home and observed contraband in plain view. *See United States v. Gaskin,* 368 A.2d 1138, 1139 (D.C. 1977). In that case, however, "[t]he crucial factual consideration [was] that the officer was responding to a call that there was 'found property' on the premises. He was not sent to the premises for the purposes of investigating criminal activity there nor to make an arrest." *Id.* Agreeing that the police conduct constituted community caretaking, rather than criminal investigation, this court "view[ed] the entry into the apartment at the invitation of the complainant, [ ] as permissible police action." *Id.* "Since the officer was lawfully inside the apartment and then almost immediately observed the [contraband], we conclude that no search took place within the scope of the Fourth Amendment in this unusual set of circumstances." *Id.* In this case, by contrast, the police intended to search the appellant's dwelling for the shotgun—clearly a criminal investigation. *See id.* at 1139 n. 4 (internal citation and quotation omitted) ("A search implies an examination of one's premises or person with a view to the discovery of contra-

■ According to the record in this case, when Detective Timlick asked appellant for consent to search the house prior to appellant's mother's arrival and while they were outside the home, appellant said no. Appellant's unequivocal refusal to consent was a clear invocation of his Fourth Amendment right to privacy. Because the Fourth Amendment was implicated as soon as the police entered appellant's home, the trial court erred in concluding that no search took place in this case. *See* 1 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 2.3(b) (2004) ("It is beyond question, therefore, that an unconsented police entry into a residential unit, be it a house or an apartment or a hotel or motel room, constitutes a search within the meaning of *Katz v. United States* [389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)]."); *see also Payton, supra,* ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house."); *Johnson v. United States,* 333 U.S. 10, 13, 68 S.Ct. 367, 92 L.Ed. 436 (1948) (characterizing "entry to defendant's living quarters" as "the beginning of the search").[8]

### III.

■ Because the police entry into the home constituted a search in this case, we must next consider whether any exceptions to the warrant requirement apply in this case. "A search conducted without a warrant is 'per se unreasonable' under the Fourth Amendment unless it falls within a few specific and well-established exceptions." *Basnueva v. United States,* 874

A.2d 363, 369 (D.C.2005) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). Consent is such an exception. *See id.* "To justify a search under the consent exception, the government must prove by a preponderance of the evidence that consent was, in fact, freely and voluntarily given." *Id.*

■ Before the trial court, Martin argued not only that he refused to consent to a search of the home, but also that his mother's later consent was ineffective, according to the Supreme Court's recent opinion in *Georgia v. Randolph,* 547 U.S. 103, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006). In *Randolph,* a woman requested that police come into her home to find evidence of drug use by her husband; however, her husband, who was present when the police arrived, refused to consent. 547 U.S. at 107, 126 S.Ct. 1515. Despite Mr. Randolph's refusal, Mrs. Randolph led the police into the home and to the contraband. *Id.* The Supreme Court held this search to be unconstitutional despite the consent of Mrs. Randolph, a physically present resident of the home. 547 U.S. at 120, 126 S.Ct. 1515.

The Court reached this conclusion after reviewing its prior consent cases. It first acknowledged that voluntary consent excuses a warrantless search-even where the consenting individual merely shares common authority over the area. 547 U.S. at 109, 126 S.Ct. 1515. Indeed, the police may act upon the consent of one who they reasonably believe to share common au-

---

band or evidence of guilt to be used in prosecution of a criminal action."). Thus, we view *Gaskin* as confined to the "unusual set of circumstances" where the police do not intend to conduct a criminal investigation and where the resident invites the police into the home and the contraband is in plain view.

8. In supplemental briefing, the government concedes—as it must—that the entry constitutes a search. Yet the government argues that the search was reasonable. Because the trial court found that there had been no search conducted at all, it never determined whether the police reasonably entered the home.

thority, even if the person really does not. *See id.* (citing *Illinois v. Rodriguez,* 497 U.S. 177, 186, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)). The Court explained that this rationale derives not from property law, but rather from a societal understanding of the mutual use of property: tenants essentially assume the risk that co-tenants may affect their rights. 547 U.S. at 110, 126 S.Ct. 1515. But just as the Court has held that those with common authority may consent to searches, so it has also expanded the right to deny consent to those with a reasonable expectation of privacy in the premises. 547 U.S. at 113, 126 S.Ct. 1515. For example, the Court has held that an overnight guest has a reasonable expectation of privacy because "it is unlikely that [the host] will admit someone who wants to see or meet with the guest over the objection of the guest." *Id.* (citing *Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990)). Having reaffirmed the ability of those reasonably perceived as having common authority to give consent, and the ability of those with reasonable expectations of privacy to deny consent, the Court turned to a situation where two individuals who both possess common authority conflict over whether to consent. In this situation, the Court concluded that the one denying consent controls: "[A] warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent

given to the police by another resident." 547 U.S. at 120, 126 S.Ct. 1515.[9]

Thus, following *Randolph,* appellant's mother's later consent in this case did not vitiate her son's earlier denial of consent. After his initial refusal, the police could have obtained valid consent to the search only from appellant. *See United States v. Murphy,* 516 F.3d 1117, 1125 (9th Cir. 2008) (holding that the refusal of a tenant renders a co-tenant's later consent invalid, even if the co-tenant was not physically present for the refusal). Yet there is no evidence that appellant unambiguously repudiated that lack of consent prior to the police entering the home. Appellant's mother—not appellant—let the police enter the home.[10]

The government, however, disputes the applicability of *Randolph* here, arguing that the Court carved out an exception for living arrangements that reflect a recognizable hierarchy, such as parent-child. Indeed, the Court said:

> Unless the people living together fall within some recognized hierarchy, like a household of parent and child or barracks housing military personnel of different grades, there is no societal understanding of superior and inferior....

*Randolph, supra,* 547 U.S. at 114, 126 S.Ct. 1515. Thus, by implication, a parent and child household reflects a socially understood hierarchy. Because this case involves a mother and son, the government asserts that Martin's refusal to consent was inferior to—and thus, was superceded

9. But police need not seek out a non-present co-resident to see if he or she refuses to consent. 547 U.S. at 122, 126 S.Ct. 1515.

10. There is also at least some evidence that the police may have prevented Martin from speaking to his mother when she arrived on the scene. Ms. Martin testified that Martin tried to talk to her, but "the police officer told him he couldn't speak with [her]." In *Ran-*

*dolph,* the Court noted that while the police need not invite a co-resident, even one who is nearby, to participate in a request for consent to enter the home, this applies only "[s]o long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection...." 547 U.S. at 121, 126 S.Ct. 1515.

by—his mother's subsequent consent. Although the *Randolph* Court discussed recognizable hierarchies, it did so to explain the difficulty of discerning whether one resident's authority to consent was superior to another's. Indeed, the Court recognized that the common-authority and apparent-authority to consent exceptions, which permit law enforcement officers to rely upon the consent of a person they reasonably believe has authority to consent, were predicated upon the impossibility of determining the hierarchy of consent. *See Rodriguez, supra,* 497 U.S. at 186, 110 S.Ct. 2793. Given this difficulty, we do not read the cited passage as meaning that a resident's offspring can never have equal authority over a shared residence. Such a reading could lead to absurd results, such as where an adult owns a home, but has decided to care for his or her ageing parents. The parent would certainly have a right to privacy in the residence, but it would be far from clear that the parent would have superior authority over the homeowner. Rather, it is more likely that by "child," the Court meant a minor. *See* BLACK'S LAW DICTIONARY 254 (8th ed.2004) (defining "child" as "[a] person under the age of majority.").

While the record is sparse, it is clear on two significant facts: Martin was twenty-six-years old at the time he refused consent and Detective Timlick believed Martin had common authority over the home, which is why Timlick asked Martin to consent to the search. If Martin had the authority to consent to a search of his mother's home such that he could implicate her privacy rights in her absence, then he had the common authority to deny it. And once he refused consent, that refusal bound the police. *Randolph, su-*

*pra,* 547 U.S. at 120, 126 S.Ct. 1515; *Murphy, supra,* 516 F.3d at 1125. Absent any clear revocation of Martin's earlier denial of consent, the police's subsequent entry was unlawful. *See Murphy, supra,* 516 F.3d at 1125 (stating that the tenant's objection "remains effective barring some objective manifestation that he has changed his position and no longer objects").

When wholly removed from the events outside the home, what happened inside may indeed not have amounted to a search since Martin apparently retrieved the weapon either at his mother's or his own behest. But we cannot view this later act in a vacuum. Martin invoked his right to privacy; the police ignored him. Thus, he had no assurance that a repeated objection would have been met with a different result.[11] The police entry without a warrant constituted an unlawful search and the shotgun must be suppressed as the fruits of that unlawful search. *See Oliver v. United States,* 656 A.2d 1159, 1172 (D.C. 1995).

## IV.

■ We must finally consider whether Martin waived his argument that the police unlawfully entered his home in violation of the Fourth Amendment. The government asserts that Martin failed to raise this argument before either the trial court or this court. We believe, however, that the trial court faced the relevant inquiry. In moving to suppress the shotgun, appellant's trial counsel asserted that "[t]he police *entered the defendants' [sic] home* without a warrant," and that although the mother consented to a search, "the defen-

---

11. We note that while his later act of surrendering the shotgun appears to have been voluntary cooperation in response to a valid police ultimatum (*i.e.,* "hand over the weapon or we will get a search warrant"), Martin had declined the exact same ultimatum outside the home, that is, before the police ignored his denied consent.

dant was present denying the authority." Further, in response to the court's inquiry during the motion hearing as to the basis for suppression, defense counsel replied, "[the police] had no probable cause *to enter and search the house.*"

In addition, defense counsel cited *Georgia v. Randolph* as supporting his argument that the police conducted an unlawful search: "the case of *Georgia v. Randolph* examines this problem exactly." Appellant's trial counsel's reference to *Randolph* as "exactly" examining his client's problem further apprised the trial court of the relevant objection: *warrantless entry.* While both *Randolph* and the instant case involve a subsequent discovery of evidence (the drugs in *Randolph;* the shotgun here), it is the initial breach of the sanctity of the home that requires the consent in the first instance.

Despite these early protests to a warrantless entry, the trial court and the parties shifted focus to conduct occurring inside the home. This change in focus does not, however, negate the fact that appellant's trial counsel had presented the court with the issue of warrantless entry. Given counsel's initial framing of the issue for the court, the facts adduced at the hearing, and the citation and discussion of *Georgia v. Randolph,* we are satisfied that the trial court was sufficiently apprised of the issue on review.

We agree with the government that Martin's appellate counsel failed to argue that the entry itself constituted an unlawful search either in his principal brief or at oral argument. Counsel even conceded that he was not making an unlawful entry claim at oral argument. However, both parties have now had an opportunity to brief the issue, and we therefore believe that it is appropriate for us to decide the issue. *See Outlaw v. United States,* 632 A.2d 408, 410, 410 n. 7 (D.C.1993) (revers-

ing a conviction based on an argument first raised by this court at oral argument, but after this court invited supplemental briefing); *see also United States Nat'l Bank v. Independent Ins. Agents of Am.,* 508 U.S. 439, 447, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) ("[A] court may consider an issue antecedent to ... and ultimately dispositive of the dispute before it, even an issue the parties fail to identify and brief.") (internal quotations omitted.).

The trial court found that "[t]here wasn't a single search conducted." But a search occurs the moment the home's threshold is crossed. Here, because the police crossed that threshold without a warrant and over Martin's protest, they violated *Georgia v. Randolph* and conducted an unlawful search. Accordingly, the trial court's denial of the motion to suppress is

*Reversed.*

FARRELL, Associate Judge, Retired, concurring:

When, following the suppression hearing testimony, the trial judge asked appellant's counsel "what's the search," counsel said that it was the retrieval of the gun from the closet by appellant, something he had done under "threat" by the police that otherwise they would obtain a warrant and search the entire house, if necessary. The judge ruled that appellant's own actions were not a search—that merely by giving him a choice that included *avoiding* a search, the police had not made him an agent of the government.

We now reverse, however, on the different ground that the warrantless entry of the house, undeniably a "search," was unlawful because effected over appellant's refusal to consent to the entry. Apparently uncertain himself whether that issue had been preserved, appellant's counsel did not

raise it either in his brief or at oral argument in this court.

I nonetheless agree that we should not consider the point forfeited. At trial, appellant's counsel directed the court to *Georgia v. Randolph*, 547 U.S. 103, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006), and his written motion to suppress contained enough language—though barely so—to inform the court that appellant was challenging the unconsented entry as part of the "search of the house." As for appellant's omissions on appeal, the government concedes that our decisions are not uniform in imposing strict forfeiture of issues not raised by a defendant until prompted by the court in supplemental briefing, as in this case. *Compare, e.g., Anthony v. United States*, 935 A.2d 275, 282–83 n. 10 (D.C. 2007), *with Rose v. United States*, 629 A.2d 526, 535–36 (D.C.1993). The entry and consent issues have now been briefed, and the government does not argue that the trial record is too undeveloped to permit a decision on the applicability of *Randolph* to this case.

On the merits, I agree that *Randolph* requires suppression, although I confess to uncertainty about the reach of that decision. Appellant was a mature adult residing in the home—"an inhabitant of shared premises"—and thus not a dependent within "some recognized hierarchy, like a household of parent and child," 547 U.S. at 114, 126 S.Ct. 1515, such that the police could ignore his refusal to consent in favor of the mother's permission.[1] The government points to his admission (in the motion to suppress) that his mother owned the house, and seeks to limit *Randolph* to situations involving "parties with equal authority" in the property sense, such as "co-tenants." But the Court there used words such as "co-tenant," "co-inhabitant," and

"fellow occupant" or "resident" more or less interchangeably; and its precise holding was that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given ... by another resident." *Id.* at 120, 126 S.Ct. 1515. As appellant shared residency of the home with his mother, yet was not a "child" in any sense connoting a "societal understanding of superior and inferior," *id.* at 114, *Randolph* did not allow the police to disregard his refusal to consent. A contrary rule would encourage police to ignore refusal by a person with apparent authority to deny entry and to look instead for another, more compliant resident with a "superior" right to consent, when *Randolph* implies that the incentives should run the other way—toward obtaining a search warrant if no exigent circumstances exist.

---

1. Nor was there evidence that his privacy expectation in the home was limited to a particular room or rooms, as in the case of a boarder or room-renter.