Justice THOMAS, concurring.
I join the opinion of the Court, which faithfully applies Georgia v. Randolph, 547 U.S. 103, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006). I write separately to make clear the extent of my disagreement with Randolph .
I dissented in Randolph because the facts of that case did not implicate a Fourth Amendment search and never should have been analyzed as such. Id., at 145, 126 S.Ct. 1515 (THOMAS, J., dissenting) ("[N]o Fourth Amendment search occurs where ... the spouse of an accused voluntarily leads the police to potential evidence of wrongdoing by the accused"). Instead of deciding the case on that narrow ground, the majority in Randolph looked to "widely shared social expectations" to resolve whether the wife's consent to a search should control over her husband's objection. Id., at 111, 126 S.Ct. 1515. I find no support for that novel analytical approach in the Fourth Amendment's text or history, or in this Court's jurisprudence. See id., at 128-131, 126 S.Ct. 1515 (ROBERTS, C.J., dissenting). Accordingly, given a blank slate, I would analyze this case consistent with THE CHIEF JUSTICE's dissent in Randolph : "A warrantless search is reasonable if police obtain the voluntary consent of a person authorized to give it." Id., at 128, 126 S.Ct. 1515. That is because "[c]o-occupants have 'assumed the risk that one of their number might permit [a] common area to be searched.' " Ibid. (quoting United States v. Matlock, 415 U.S. 164, 171, n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) ). In this case, the trial court found that Rojas' consent was voluntary, see ante, at n. 2, and petitioner does not contest that Rojas had common authority over the premises. That should be the end of the matter.
Justice GINSBURG, with whom Justice SOTOMAYOR and Justice KAGAN join, dissenting.
*310 The Fourth Amendment guarantees to the people "[t]he right ... to be secure in their ... houses ... against unreasonable searches and seizures." Warrants to search premises, the Amendment further instructs, shall issue only when authorized by a neutral magistrate upon a showing of "probable cause" to believe criminal activity has occurred or is afoot. This Court has read these complementary provisions to convey that, "whenever practicable, [the police must] obtain advance judicial approval of searches and seizures through the warrant procedure."
*1139 Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The warrant requirement, Justice Jackson observed, ranks among the "fundamental distinctions between our form of government, where officers are under the law, and the police-state where they are the law." Johnson v. United States, 333 U.S. 10, 17, 68 S.Ct. 367, 92 L.Ed. 436 (1948). The Court has accordingly declared warrantless searches, in the main, "per se unreasonable." Mincey v. Arizona, 437 U.S. 385, 390, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (internal quotation marks omitted); see Groh v. Ramirez, 540 U.S. 551, 559, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004). If this main rule is to remain hardy, the Court has explained, exceptions to the warrant requirement must be "few in number and carefully delineated." United States v. United States Dist. Court for Eastern Dist. of Mich., 407 U.S. 297, 318, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) ; see Kyllo v. United States, 533 U.S. 27, 31, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001).
Instead of adhering to the warrant requirement, today's decision tells the police they may dodge it, nevermind ample time to secure the approval of a neutral magistrate. Suppressing the warrant requirement, the Court shrinks to petite size our holding in Georgia v. Randolph, 547 U.S. 103, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006), that "a physically present inhabitant's express refusal of consent to a police search [of his home] is dispositive as to him, regardless of the consent of a fellow occupant," id. , at 122-123, 126 S.Ct. 1515.
*311 I
This case calls for a straightforward application of Randolph . The police officers in Randolph were confronted with a scenario closely resembling the situation presented here. Once the police arrived at Janet and Scott Randolph's shared residence, Scott Randolph "unequivocally refused" an officer's request for permission to search their home. Georgia v. Randolph, 547 U.S. 103, 107, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006). The officer then asked Janet Randolph for her consent to the search, which she "readily gave." Ibid. The sequence here was similar. After Walter Fernandez, while physically present at his home, rebuffed the officers' request to come in, the police removed him from the premises and then arrested him, albeit with cause to believe he had assaulted his cohabitant, Roxanne Rojas. At the time of the arrest, Rojas said nothing to contradict Fernandez' refusal. About an hour later, however, and with no attempt to obtain a search warrant, the police returned to the apartment and prevailed upon Rojas to sign a consent form authorizing search of the premises. See infra, at 1143, n. 5.
The circumstances triggering "the Fourth Amendment's traditional hostility to police entry into a home without a warrant," 547 U.S., at 126, 126 S.Ct. 1515 (BREYER, J., concurring), are at least as salient here as they were in Randolph . In both cases, "[t]he search at issue was a search solely for evidence"; "[t]he objecting party," while on the premises, "made his objection [to police entry] known clearly and directly to the officers seeking to enter the [residence]"; and "the officers might easily have secured the premises and sought a warrant permitting them to enter." Id., at 125-126, 126 S.Ct. 1515. Here, moreover, with the objector in custody, there was scant danger to persons on the premises, or risk that evidence might be destroyed or concealed, pending request for, and receipt of, a warrant. See id., at 126, 126 S.Ct. 1515.
Despite these marked similarities, the Court removes this case from Randolph 's ambit. The Court does so principally *312 by seizing on the fact that Fernandez, unlike *1140 Scott Randolph, was no longer present and objecting when the police obtained the co-occupant's consent. Ante, at 1133 - 1134. But Fernandez was present when he stated his objection to the would-be searchers in no uncertain terms. See App. 6 ("You don't have any right to come in here. I know my rights." (internal quotation marks omitted)). The officers could scarcely have forgotten, one hour later, that Fernandez refused consent while physically present. That express, on-premises objection should have been "dispositive as to him." Randolph, 547 U.S., at 122, 126 S.Ct. 1515.[1]
The Court tells us that the "widely shared social expectations" and "customary social usage" undergirding Randolph 's holding apply only when the objector remains physically present. Ante, at 1135 (internal quotation marks omitted). Randolph 's discussion of social expectations, however, does not hinge on the objector's physical presence vel non at the time of the search. "[W]hen people living together disagree over the use of their common quarters," Randolph observes, "a resolution must come through voluntary accommodation, not by appeals to authority." 547 U.S., at 113-114, 126 S.Ct. 1515. See also id., at 114, 126 S.Ct. 1515 ("[T]here is no common understanding that one co-tenant generally has a right or authority to prevail over the express wishes of another, whether the issue is the color of the curtains or invitations *313 to outsiders."); id., at 115, 126 S.Ct. 1515 ("[T]he cooperative occupant's invitation adds nothing to the government's side to counter the force of an objecting individual's claim to security against the government's intrusion into his dwelling place."). Randolph thus trained on whether a joint occupant had conveyed an objection to a visitor's entry, and did not suggest that the objection could be ignored if the police reappeared post the objector's arrest.
A visitor might be less reluctant to enter over a joint occupant's objection, the Court speculates, if that visitor knows the objector will not be there. See ante, at 1135 - 1136. "Only in a Hobbesian world," however, "would one person's social obligations to another be limited to what the other [, because of his presence,] is ... able to enforce." United States v. Henderson, 536 F.3d 776, 787 (C.A.7 2008) (Rovner, J., dissenting). Such conjectures about social behavior, at any rate, shed little light on the constitutionality of this warrantless home search, given the marked distinctions between private interactions and police investigations. Police, after all, have power no private person enjoys. They can, as this case illustrates, put a tenant in handcuffs and remove him from the premises.
Moreover, as the Court comprehended just last Term, "the background social norms that invite a visitor to the front door do not invite him there to conduct a search."
*1141 Florida v. Jardines, 569 U.S. 1, ----, 133 S.Ct. 1409, 1416, 185 L.Ed.2d 495 (2013). Similarly here, even if shared tenancy were understood to entail the prospect of visits by unwanted social callers while the objecting resident was gone, that unwelcome visitor's license would hardly include free rein to rummage through the dwelling in search of evidence and contraband.[2]
*314 Next, the Court cautions, applying Randolph to these facts would pose "a plethora of practical problems." Ante, at 1135. For instance, the Court asks, must a cotenant's objection, once registered, be respected indefinitely? Yet it blinks reality to suppose that Fernandez, by withholding consent, could stop police in their tracks eternally. Cf. ante, at 1135 - 1136 (imagining an objector behind bars serving his sentence, still refusing permission to search his residence). To mount the prosecution eventuating in a conviction, of course, the State would first need to obtain incriminating evidence, and could get it easily simply by applying for a warrant. Warrant in police hands, the Court's practical problems disappear.
Indeed, as the Court acknowledges, see ante, at 1136 - 1137, reading Randolph to require continuous physical presence poses administrative difficulties of its own. Does an occupant's refusal to consent lose force as soon as she absents herself from the doorstep, even if only for a moment? Are the police free to enter the instant after the objector leaves the door to retire for a nap, answer the phone, use the bathroom, or speak to another officer outside? See Brief for Petitioner 28. Hypothesized practical considerations, in short, provide no cause for today's drastic reduction of Randolph 's holding and attendant disregard for the warrant requirement.
II
In its zeal to diminish Randolph, today's decision overlooks the warrant requirement's venerable role as the *315 "bulwark of Fourth Amendment protection." Franks v. Delaware, 438 U.S. 154, 164, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Reducing Randolph to a "narrow exception," the Court declares the main rule to be that "consent by one resident of jointly occupied premises is generally sufficient to justify a warrantless search." Ante, at 1133. That declaration has it backwards, for consent searches themselves are a " 'jealously and carefully drawn' exception" to "the Fourth Amendment rule ordinarily prohibiting the warrantless entry of a person's house as unreasonable per se ." Randolph, 547 U.S., at 109, 126 S.Ct. 1515 (quoting Jones v. United States, 357 U.S. 493, 499, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958) ). See also Jardines, 569 U.S., at ----, 133 S.Ct., at 1414 ("[W]hen it comes to the Fourth Amendment, the home is first among equals. At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' "); *1142 Payton v. New York, 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) ("[T]he physical entry of the home is the chief evil against which ... the Fourth Amendment is directed." (internal quotation marks omitted)).[3] *316 In this case, the police could readily have obtained a warrant to search the shared residence.[4] The Court does not dispute this, but instead disparages the warrant requirement as inconvenient, burdensome, entailing delay "[e]ven with modern technological advances."Ante, at 1137. Shut from the Court's sight is the ease and speed with which search warrants nowadays can be obtained. See Missouri v. McNeely, 569 U.S. ----, ----, 133 S.Ct. 1552, 1561-1562, 185 L.Ed.2d 696 (2013) (observing that technology now "allow[s] for the more expeditious processing of warrant applications," and citing state statutes permitting warrants to be obtained " remotely through various means, including telephonic or radio communication, electronic communication ..., and video conferencing"). See also Brief for National Association of Criminal Defense Lawyers as Amicus Curiae 29 (describing California's procedures for electronic warrant applications). With these developments in view, dilution of the warrant requirement should be vigilantly resisted. *317 Although the police have probable cause and could obtain a warrant with dispatch, if they can gain the consent of someone *1143 other than the suspect, why should the law insist on the formality of a warrant? Because the Framers saw the neutral magistrate as an essential part of the criminal process shielding all of us, good or bad, saint or sinner, from unchecked police activity. See, e.g., Johnson v. United States, 333 U.S. 10, 13-14, 68 S.Ct. 367, 92 L.Ed. 436 (1948) ("The point of the Fourth Amendment ... is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime."). "The investigation of crime," of course, "would always be simplified if warrants were unnecessary." Mincey v. Arizona, 437 U.S. 385, 393, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). "But the Fourth Amendment," the Court has long recognized, "reflects the view of those who wrote the Bill of Rights that the privacy of a person's home and property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law." Ibid. See also Randolph, 547 U.S., at 115, n. 5, 126 S.Ct. 1515 ("A generalized interest in expedient law enforcement cannot, without more, justify a warrantless search.").
A final word is in order about the Court's reference to Rojas' autonomy, which, in its view, is best served by allowing her consent to trump an abusive cohabitant's objection. See ante, at 1137 ("Denying someone in Rojas' position the right to allow the police to enter her home would also show disrespect for her independence.").[5] Rojas' situation is not *318 distinguishable from Janet Randolph's in this regard. If a person's health and safety are threatened by a domestic abuser, exigent circumstances would justify immediate removal of the abuser from the premises, as happened here. Cf. Randolph, 547 U.S., at 118, 126 S.Ct. 1515 ("[T]his case has no bearing on the capacity of the police to protect domestic victims.... No question has been raised, or reasonably could be, about the authority of the police to enter a dwelling to protect a resident from domestic violence...."). See also Brigham City v. Stuart, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006) ("[L]aw enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."). Domestic abuse is indeed "a serious problem in the United States," Randolph, 547 U.S., at 117, 126 S.Ct. 1515 (citing statistics); appropriate policy responses to *1144 this scourge may include fostering effective counseling, providing public information about, and ready access to, protective orders, and enforcing such orders diligently.[6] As the Court *319 understood in Randolph, however, the specter of domestic abuse hardly necessitates the diminution of the Fourth Amendment rights at stake here.
For the reasons stated, I would honor the Fourth Amendment's warrant requirement and hold that Fernandez' objection to the search did not become null upon his arrest and removal from the scene. "There is every reason to conclude that securing a warrant was entirely feasible in this case, and no reason to contract the Fourth Amendment's dominion." Kentucky v. King, 563 U.S. ----, ----, 131 S.Ct. 1849, 1866, 179 L.Ed.2d 865 (2011) (GINSBURG, J., dissenting). I would therefore reverse the judgment of the California Court of Appeal.

The Court is correct that this case does not involve a situation, alluded to in Randolph, where "the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection." Georgia v. Randolph, 547 U.S. 103, 121, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006). Here, as in Randolph, no one disputes that the police had probable cause to place the objecting tenant under arrest. But had the objector's arrest been illegal, Randolph suggested, the remaining occupant's consent to the search would not suffice. The suggestion in Randolph, as the Court recognizes, see ante, at 1134 - 1135, is at odds with today's decision. For "[i]f the police cannot prevent a co-tenant from objecting to a search through arrest, surely they cannot arrest a co-tenant and then seek to ignore an objection he has already made." United States v. Murphy, 516 F.3d 1117, 1124-1125 (C.A.9 2008).

Remarkably, the Court thinks my disagreement with its account of the applicable social norms distances me from Randolph 's understanding of social expectations. See ante, at 1135, n. 5. Quite the opposite. Randolph considered whether "customary social understanding accords the consenting tenant authority powerful enough to prevail over the co-tenant's objection"; social practice in such circumstances, the Court held, provided no cause to depart from the " 'centuries-old principle of respect for privacy of the home.' " 547 U.S., at 115, 121, 126 S.Ct. 1515 (quoting Wilson v. Layne, 526 U.S. 603, 610, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) ). See also 547 U.S., at 115, 126 S.Ct. 1515 ("Disputed permission is ... no match for this central value of the Fourth Amendment...."). I would so hold here. Today's decision, by contrast, provides police with ready means to nullify a cotenant's objection, and therefore "fails to come to grips with the reasoning of [Randolph ]." Ante, at 1135, n. 5.

I agree with the Court that when a sole owner or occupant consents to a search, the police can enter without obtaining a warrant. See ante, at 1131 - 1132. Where multiple persons occupy the premises, it is true, this Court has upheld warrantless home searches based on one tenant's consent; those cases, however, did not involve, as this case does, an occupant who told the police they could not enter. See United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) (police relied on cotenant's consent to search when other tenant had already been detained in a nearby squad car); Illinois v. Rodriguez, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (same, when the other tenant was asleep in the bedroom). The Court's rationale for allowing a search to proceed in those instances-that co-occupants "assum[e] the risk that one of their number might permit the common area to be searched," Matlock, 415 U.S., at 171, n. 7, 94 S.Ct. 988 -does not apply where, as here, an occupant on the premises explicitly tells the police they cannot search his home sans warrant. See United States v. Henderson, 536 F.3d 776, 788 (C.A.7 2008) (Rovner, J., dissenting) (in such circumstances, the objector "has not assumed the risk that his co-tenant may subsequently admit the visitor, because all choice has been taken from him in his involuntary removal from the premises").

The Court dismisses as "beside the point" the undeniable fact that the police easily could have obtained a warrant. Ante, at 1132, n. 4. There may be circumstances, the Court observes, in which the police, faced with a cotenant's objection, will lack probable cause to obtain a warrant. That same argument was considered and rejected by the Court in Randolph, which recognized that "alternatives to disputed consent will not always open the door to search for evidence that the police suspect is inside." 547 U.S., at 120, 126 S.Ct. 1515. Moreover, it is unlikely that police, possessing an objective basis to arrest an objecting tenant, will nevertheless lack probable cause to obtain a search warrant. Probable cause to arrest, I recognize, calls for a showing discrete from the showing needed to establish probable cause to search a home. But "where, as here, a suspect is arrested at or near his residence, it will often 'be permissible to infer that the instrumentalities and fruits of th[e] crime are presently in that person's residence.' " Brief for National Association of Criminal Defense Lawyers as Amicus Curiae 25 (quoting 2 W. LaFave, Search and Seizure § 3.1(b) (5th ed. 2011) ). And as the Court observed in Randolph, if a warrant may be impeded by a tenant's refusal to consent, "[a] co-tenant acting on [her] own initiative may be able to deliver evidence to the police, and ... tell the police what [s]he knows, for use before a magistrate in getting a warrant." 547 U.S., at 116, 126 S.Ct. 1515 (citation omitted).

Although the validity of Rojas' consent is not before us, the record offers cause to doubt that her agreement to the search was, in fact, an unpressured exercise of self-determination. At the evidentiary hearing on Fernandez' motion to suppress, Rojas testified that the police, upon returning to the residence about an hour after Fernandez' arrest, began questioning her four-year-old son without her permission. App. 81, 93. Rojas asked to remain present during that questioning, but the police officer told her that their investigation was "going to determine whether or not we take your kids from you right now or not." Id., at 93. See also ibid. ("I felt like [the police] were going to take my kids away from me."). Rojas thus maintained that she felt "pressured" into giving consent. Id., at 93-94. See also id., at 93 ("I felt like I had no rights."). After about 20 or 30 minutes, Rojas acceded to the officer's request that she sign a consent form. Rojas testified that she "didn't want to sign [the form]," but did so because she "just wanted it to just end." Id., at 100.
The trial court found Rojas' testimony at the suppression hearing "believable at points and unbelievable at other points," and concluded that the police conduct did not amount to "duress or coercion." Id., at 152. The trial court agreed, however, that Rojas "may have felt pressured." Ibid.

See generally National Council of Juvenile and Family Court Judges, Civil Protection Orders: A Guide for Improving Practice (2010), online at http://www.ncjfcj.org/sites/default/files/cpo_guide.pdf (all Internet materials as visited Feb. 21, 2014, and available in Clerk of Court's case file); Epidemiology and Prevention for Injury Control Branch, California Statewide Policy Recommendations for the Prevention of Violence Against Women (2006), online at http://www.cdph.ca. gov/programs/Documents/VAWSPP-EPIC.pdf.
* * *