Argued and submitted January 28, reversed and remanded July 7, petition
for review denied December 23, 2010 (349 Or 479)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

RICHARD IRVING CASTER,
*Defendant-Appellant.*

Lake County Circuit Court
060254CR; A137030

234 P3d 1087

Bronson James argued the cause for appellant. On the
brief were Peter Gartlan, Chief Defender, and Rebecca A.

Duncan, Assistant Chief Defender, Appellate Division, Office of Public Defense Services.

Matthew J. Lysne, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Rosenblum, Judge.

ROSENBLUM, J.

## ROSENBLUM, J.

Police arrived at defendant's home to investigate a report that defendant, a felon, was in possession of a firearm. They sought defendant's consent to search his home, but he refused. The officers then arrested defendant on an outstanding warrant. Once defendant had been escorted from his home and placed in a patrol car, the officers sought and obtained consent from the co-occupant of the home to enter and seize firearms. The question in this case is whether, for purposes of the Fourth Amendment, the co-occupant's voluntary consent justified the warrantless entry of the home, notwithstanding defendant's earlier objection. The issue is one that has split federal circuit courts in the wake of *Georgia v. Randolph*, 547 US 103, 126 S Ct 1515, 164 L Ed 2d 208 (2006), and one of first impression in this court. For the reasons that follow, we hold that defendant's arrest did not vitiate his previously registered objection to a search of his home, and that the co-occupant's subsequent consent was ineffective as to defendant. Accordingly, we reverse and remand.

We recite the facts "consistently with the trial court's factual findings and its decision denying defendant's motion to suppress." *State v. Shaff*, 343 Or 639, 641, 175 P3d 454 (2007). In September 2006, defendant's neighbor reported to police that she had seen defendant, whom she knew to be a felon, carrying a rifle from his vehicle; police also received a report that there was a "dog-at-large" near defendant's residence. Officers Hargis and Pole responded separately to those reports and encountered defendant and his girlfriend, Hanscomb, in the driveway of their home. Hargis asked defendant and Hanscomb where they had been, and they replied that they had been target shooting. Hanscomb told the officers that she had attempted to use a new rifle, but it had malfunctioned. Defendant admitted carrying the rifle's case, but he denied carrying or using the rifle itself. Rather, he claimed to have fired only a BB or pellet gun.

Hargis then asked about the location of the guns. Hanscomb told him that the rifle was in a gun cabinet in the house, along with another rifle that she owned. Defendant indicated that there were also pistols in the house that

belonged to his sons. At that point, Hargis contacted dispatch and confirmed that defendant was, in fact, a convicted felon. Hargis also learned that there was a warrant out for defendant's arrest.

Hargis next asked defendant and Hanscomb, both of whom lived at the house, whether they would consent to a search of the house and seizure of the firearms. Hanscomb indicated that she would consent, but defendant refused, telling the police, "No, get a warrant." Defendant also told Hanscomb to call an attorney.

After defendant refused to allow the officers to enter his house, they took him into custody on the arrest warrant and escorted him away from the house. Additional officers arrived on the scene, and Hanscomb was led into the house to get a telephone book to call an attorney. She returned outside and began making phone calls.

Meanwhile, Hargis had phoned the district attorney, Schutt, to discuss whether to obtain a search warrant, and shortly after defendant was arrested, Schutt arrived at the house. He explained to Hanscomb that she could either voluntarily turn over the firearms that were in the house, or he could apply for a search warrant. Hanscomb then asked for and received permission to make additional phone calls, which she did for 10 to 15 minutes. After mulling her options, Hanscomb told Schutt that she would not consent to a search of the house but would "consent to let the officers take the guns." Schutt passed that information along to Hargis, expecting him to "deal with getting them turned over physically."

Hargis spoke with Hanscomb about the logistics of retrieving the firearms from inside the house. Hargis had officer safety concerns about Hanscomb entering and retrieving the firearms on her own, and Hanscomb agreed to allow Hargis and another officer to accompany her into the house. Once they entered the house, Hanscomb led the officers to a gun cabinet, which she opened. The officers could see "numerous firearms and ammunition," and seven guns were seized—two pistols, two shotguns, and three rifles. Three of the guns were loaded, and the officers "ma[d]e those safe."

The police were in the house for a total of six or seven minutes.

Defendant was charged with multiple counts of felon in possession of a firearm, ORS 166.270. He then moved to suppress evidence of the firearms seized by police when they entered his home. The motion was based on *Randolph,* a then-recent decision in which the Supreme Court held that "a physically present co-occupant's stated refusal to permit entry prevails" over the voluntary consent of the other occupant. 547 US at 106. Defendant contended that his circumstances were indistinguishable from those in *Randolph*, and that the warrantless entry into his home was unreasonable, notwithstanding Hanscomb's later consent to the officers' entry and seizure of evidence.

The state, in response, argued that defendant's situation was entirely distinguishable from *Randolph*, and the warrantless entry was justified, because the police did not "search" defendant's home over his objection, as they had done in *Randolph*; rather, with Hanscomb's consent, they entered the house for the specific purpose of seizing evidence that Hanscomb herself could have delivered to them. The trial court was persuaded by that reasoning and denied defendant's motion on the ground that "the police had valid consent from a household member to seize certain items from her house over the objections of the defendant that the state could not search." The court further explained:

> "[T]here is a distinct difference between a search and seizure, and had the state conducted a search, rather than a seizure, over the objection of defendant, the result of this motion would be different. However, the state did not search and merely retrieved evidence upon the consent of a party having control over that object."

Following the denial of his motion to suppress, defendant entered a conditional guilty plea to four counts of felon in possession of a firearm, reserving the right to appeal the denial of his motion to suppress.[1]

On appeal, defendant reprises his arguments that the warrantless entry into his home was indeed a search;

---

[1] The remaining counts were dismissed.

that, in any event, the Fourth Amendment, as made applicable to the states by the Fourteenth Amendment, prohibits police from entering a person's home—without a warrant and over the person's objection—to find and remove evidence; and that the case is indistinguishable from *Randolph*. The state, in response, essentially jettisons its argument below (and the trial court's reasoning) that *Randolph* is inapplicable because police entered the home to "seize" but not "search." Instead, the state now contends that, once defendant was arrested, the Fourth Amendment calculus changed, because he was no longer "present and objecting" to the search; in that circumstance, the state argues, Hanscomb's authority to consent to the officers' entry of the home prevails over defendant's earlier objection.

Because it is central to the issue before us, we begin by discussing *Randolph* in some detail. That case arose out of a domestic dispute between Janet Randolph and her husband, Scott Randolph. Janet Randolph complained to the police that her husband had taken their son away, and when officers arrived at their house, she told them that her husband had a cocaine habit that was creating financial troubles for the couple. Shortly after the police arrived, Scott Randolph returned home and explained that he had taken their son to a neighbor's house out of concern that his wife would leave the country with the child. 547 US at 107.

After their son was reclaimed from the neighbor's house, Janet Randolph renewed her complaints about her husband's drug use and also volunteered that there was drug evidence in the house. *Id.* At that point, one of the officers asked Scott Randolph for consent to search the house, "which he unequivocally refused." *Id.* The officer then turned to Janet Randolph for consent, "which she readily gave." *Id.* She led the officers into the house to an upstairs bedroom, which she identified as her husband's. The officer noticed a drinking straw with a powdery residue that he suspected was cocaine. He left the house to obtain an evidence bag and to call the district attorney's office. The district attorney's office instructed the officer to apply for a search warrant, which he did. Police returned after obtaining the warrant and seized further evidence of drug use, and Scott Randolph was indicted for possession of cocaine. *Id.*

Scott Randolph then moved to suppress the evidence of drug use on the ground that it was the product of the initial, warrantless search of his house. The trial court denied the motion on the ground that Janet Randolph had common authority to consent to that search. The Georgia Court of Appeals, and then the Georgia Supreme Court, disagreed with that conclusion, holding that Janet Randolph's consent to search was invalid in the face of Scott Randolph's objection. The United States Supreme Court "granted certiorari to resolve a split of authority on whether one occupant may give law enforcement effective consent to search shared premises, as against a co-tenant who is present and states a refusal to permit the search." 547 US at 108.

The starting point for the Court's analysis was "the Fourth Amendment rule ordinarily prohibiting the warrantless entry of a person's house as unreasonable *per se*[.]" *Id.* at 109 (citing *Payton v. New York*, 445 US 573, 586, 100 S Ct 1371, 63 L Ed 2d 639 (1980), and *Coolidge v. New Hampshire*, 403 US 443, 454-55, 91 S Ct 2022, 29 L Ed 2d 564 (1971)). That ordinary rule, the Court explained, has a " 'jealously and carefully drawn' exception" that recognizes "the validity of searches with the voluntary consent of an individual possessing authority." 547 US at 109 (quoting *Jones v. United States*, 357 US 493, 499, 78 S Ct 1253, 2 L Ed 2d 1514 (1958)). Under prior case law—namely, *Illinois v. Rodriguez*, 497 US 177, 110 S Ct 2793, 111 L Ed 2d 148 (1990), and *United States v. Matlock*, 415 US 164, 94 S Ct 988, 39 L Ed 2d 242 (1974)— consent by a fellow occupant who shared common authority over the premises (or even someone whom the police reasonably believed to share that authority) was sufficient to justify a search of the premises. However, "none of [the Court's] co-occupant consent-to-search cases * * * presented the further fact of a second occupant physically present and refusing permission to search, and later moving to suppress evidence so obtained." 547 US at 109. "The significance of such a refusal," the Court explained, "turns on the underpinnings of the co-occupant consent rule, as recognized since *Matlock*." *Id.*

And so the Court turned to its prior search cases, exploring the basis for its holding in *Matlock* that " 'the consent of one who possesses *common authority* over premises or effects is valid as against the absent, nonconsenting person

with whom that authority is shared.'" 547 US at 110 (quoting *Matlock*, 415 US at 170; emphasis added). The "common authority" described in *Matlock*, the Court explained, can be "broader than the rights accorded by property law": "The constant element in assessing Fourth Amendment reasonableness in the consent cases, then, is the great significance given to widely shared social expectations, which are naturally enough influenced by the law of property, but not controlled by its rules." *Randolph*, 547 US at 110-11. That is, "the reasonableness of [a consent search] is in significant part a function of commonly held understanding about the authority that co-inhabitants may exercise in ways that affect each other's interests." *Id.* at 111.

Shared tenancy, the Court went on to explain, generally carries with it certain commonly held understandings—including the understanding that co-occupants "assum[e] the risk" that "any one of them may admit visitors, with the consequence that a guest obnoxious to one may nevertheless be admitted in [that occupant's] absence by another." *Id.* Police, under the rule of *Matlock*, are entitled to rely on that understanding and have "no burden * * * to eliminate the possibility of atypical arrangements, in the absence of reason to doubt that the regular scheme was in place." 547 US at 112.[2]

The Court then analyzed the relevant question in *Randolph*—*i.e.*, the "reasonableness of police entry in reliance on consent by one occupant subject to immediate challenge by another"—in terms of whether there exists a "common understanding" regarding the rights of disagreeing co-occupants. The Court explained that, in the absence of

---

[2] At the same time, there are circumstances in which "neither state-law property rights, nor common contractual arrangements, nor any other source points to a common understanding of authority to admit third parties generally without the consent of a person occupying the premises," such as when a landlord or manager offers to admit guests without the consent of the current occupant, *Randolph*, 547 US at 112; moreover, some occupants might lack any perceived authority to consent to certain searches—for example, no one calling on the home of an eight-year-old child would reasonably expect that child to be in a position to authorize the guest to rummage through the parents' bedroom, *id*. In either of the latter situations (where there is no common understanding as to authority, or a common understanding that such authority does not exist), the police cannot reasonably rely on third-party consent as the justification to enter and search the premises. *Id.*

some recognized hierarchy (like military personnel of varying ranks housed in barracks), "there is no societal understanding of superior and inferior, a fact reflected in a standard formulation of domestic property law * * *." *Id.* at 114. "In sum," the Court concluded, "there is no common understanding that one co-tenant generally has a right or authority to prevail over the express wishes of another, whether the issue is the color of the curtains or invitations to outsiders." *Id.*

That lack of "common understanding" was dispositive in *Randolph*:

> "Since the co-tenant wishing to open the door to a third party has no recognized authority in law or social practice to prevail over a present and objecting co-tenant, his disputed invitation, without more, gives a police officer no better claim to reasonableness in entering than the officer would have in the absence of any consent at all."

*Id.* Accordingly, in the balancing of competing interests that is required under the Fourth Amendment, "the cooperative occupant's invitation adds nothing to the government's side to counter the force of an objecting individual's claim to security against the government's intrusion into his dwelling place." *Id.* at 115-16. And that was so, the Court explained, despite "countervailing claims" such as the consenting tenant's "interest as a citizen in bringing criminal activity to light" or "legitimate self-interest in siding with the police to deflect suspicion raised by sharing quarters with a criminal[.]" *Id.* at 116. "[S]ociety can often have the benefit of these interests," the Court reasoned, "without relying on a theory of consent that ignores an inhabitant's refusal to allow a warrantless search." *Id.* at 116. For example, the "co-tenant acting on his own initiative may be able to deliver evidence to the police," or "can tell the police what he knows, for use before a magistrate in getting a warrant." *Id.* The Court also rejected, in an extended discussion, the principal dissent's position that the Court's holding would endanger victims of domestic violence; in the majority's view, "[t]he undoubted right of the police to enter in order to protect a victim * * * has nothing to do with * * * whether a search with the consent of one co-tenant is good against another, standing at the door and expressly refusing consent." *Id.* at 118-19. The Court then summarized its holding in this way:

"The dissent's red herring aside, we know, of course, that alternatives to disputed consent will not always open the door to search for evidence that the police suspect is inside. The consenting tenant may simply not disclose enough information, or information factual enough, to add up to a showing of probable cause, and there may be no exigency to justify fast action. But nothing in social custom or its reflection in private law argues for placing a higher value on delving into private premises to search for evidence in the face of disputed consent, than on requiring clear justification before the government searches private living quarters over a resident's objection. *We therefore hold that a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident.*"

*Id.* at 120 (footnote omitted; emphasis added).

After expressing its holding, the Court proceeded to tie up "two loose ends." *Id.* The first was a question that arose in light of the statement in *Matlock* that co-inhabitants individually have the right to permit inspection: "If *Matlock's* co-tenant is giving permission 'in his own right,' how can his 'own right' be eliminated by another tenant's objection?"[3] *Randolph*, 547 US at 120. The answer to that question, the Court explained, is that the "right" to which *Matlock* referred is not an "enduring and enforceable ownership right" under private property law, but "is instead the authority recognized by customary social usage as having a substantial bearing on Fourth Amendment reasonableness in specific circumstances." *Id.* at 120-21. Therefore,

"to ask whether the consenting tenant has the right to admit the police when a physically present fellow tenant

---

[3] Chief Justice Roberts, in his dissent, emphasized that aspect of *Matlock's* reasoning:

"The common thread in our decisions upholding searches conducted pursuant to third-party consent is an understanding that a person 'assume[s] the risk' that those who have access to and control over his shared property might consent to a search. * * * And we concluded that shared use of property makes it 'reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right.'"

*Randolph*, 547 US at 134 (Roberts, C. J., dissenting) (quoting *Matlock*, 415 US at 171 n 7) (alteration in *Randolph*).

objects is not to question whether some property right may be divested by the mere objection of another. *It is, rather, the question whether customary ' social understanding accords the consenting tenant authority powerful enough to prevail over the co-tenant's objection.* The *Matlock* Court did not purport to answer this question * * *: the Court described the co-tenant's consent as good against the 'absent, nonconsenting' resident. [415 US] at 170."

*Randolph*, 547 US at 121 (emphasis added).

The "second loose end," the Court explained, was the continuing significance of *Matlock* and *Rodriguez*. In both of those cases, the defendants were nearby but not asked for consent before police entered based on the consent of a co-occupant. Distinguishing those cases from the one before it, the Court acknowledged, was an intricate task:

"If those cases are not to be undercut by today's holding, we have to admit that we are drawing a fine line; if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold collo-quy, loses out.

*"This is the line we draw, and we think the formalism is justified. So long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection, there is practical value in the simple clarity of complementary rules, one recognizing the co-tenant's permission when there is no fellow occupant on hand, the other according dispositive weight to the fellow occupant's contrary indication when he expresses it."*

*Randolph*, 547 US at 121 (emphasis added).

Finally, the Court concluded by summarizing the application of that formalistic rule to the facts of the case:

"This case invites a straightforward application of *the rule that a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant.* Scott Randolph's refusal is clear, and nothing in the record justifies the search on grounds independent of Janet Randolph's consent. The State does not argue that she gave any indication to the

police of a need for protection inside the house that might have justified entry into the portion of the premises where the police found the powdery straw (which, if lawfully seized, could have been used when attempting to establish probable cause for the warrant issued later). Nor does the State claim that the entry and search should be upheld under the rubric of exigent circumstances, owing to some apprehension by the police officers that Scott Randolph would destroy evidence of drug use before any warrant could be obtained.

"The judgment of the Supreme Court of Georgia [suppressing the evidence] is therefore affirmed."

*Id.* at 122-23 (emphasis added).

█       With that backdrop of *Randolph*, we return to the matter before us: the denial of defendant's motion to suppress.[4] We start with the trial court's reasoning—that this case is entirely distinguishable from *Randolph* because the officers here only "seized" evidence, whereas *Randolph* involved a "search." The state, as previously noted, goes to no great lengths to defend that theory on appeal—and for good reason. The Supreme Court has, in no uncertain terms, explained that Fourth Amendment protections apply equally to warrantless searches and seizures that involve government intrusions inside the home:

> "[T]he critical point is that any differences in the intrusiveness of entries to search and entries to arrest are merely ones of degree rather than kind. The two intrusions share this fundamental characteristic: the breach of the entrance to an individual's home. The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and

---

[4] Although we normally consider state constitutional questions before any federal constitutional question, this case was briefed and argued exclusively under the Fourth Amendment. Because we conclude that defendant's Fourth Amendment rights were violated, it is unnecessary for us to consider whether the defendant is entitled to greater protection under Article I, section 9, of the Oregon Constitution. *See, e.g., State v. Carsey*, 295 Or 32, 34, 664 P2d 1085 (1983) (taking that same approach); *see also State v. Kennedy*, 295 Or 260, 268, 666 P2d 1316 (1983) ("Although responsible treatment of the state claim is preferable, as stated above, if it is abandoned the court can note that fact so that the decision at least will not be a precedent on the issue.").

specific constitutional terms: 'The right of the people to be secure in their * * * houses * * * shall not be violated.' That language unequivocally establishes the proposition that '[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' *Silverman v. United States*, 365 US 505, 511, 81 S Ct 679, 683, 5 L Ed 2d 734 (1961). *In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.*"

*Payton*, 445 US at 589-90 (alterations in *Payton*; emphasis added).

■■ Moreover, nothing in *Randolph* itself suggests that a warrantless entry for purposes of a "seizure" should be treated altogether differently than a warrantless search. Indeed, *Randolph* relies on *Payton*—a seizure case—as the starting point for its analysis: "the Fourth Amendment rule ordinarily prohibiting the warrantless entry of a person's house as unreasonable *per se*[.]" 547 US at 109 (quoting *Payton*, 445 US at 586). So even assuming that the police actions in this case were not a "search" of defendant's home for purposes of the Fourth Amendment (itself a dubious proposition[5]), the rule of *Randolph* nevertheless governs the reasonableness of the *entry* into defendant's home based on a co-occupant's consent, whether that entry is for purposes of search or seizure. *See Randolph*, 547 US at 109 (explaining that the "exception for consent extends even to entries and searches with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared

---

[5] A "search," for purposes of the Fourth Amendment, occurs when "an expectation of privacy that society is prepared to consider reasonable is infringed" by the government. *United States v. Jacobsen*, 466 US 109, 114, 104 S Ct 1652, 80 L Ed 2d 85 (1984). Invasions into the sanctity of the home to obtain evidence—even short of physical invasions—fall within the protection of the Fourth Amendment. *Kyllo v. United States*, 533 US 27, 34, 121 S Ct 2038, 150 L Ed 2d 94 (2001) ("[I]n the case of the search of the interior of homes—the prototypical and hence most commonly litigated area of protected privacy—there is a ready criterion, with roots deep in the common law, of the minimal expectation of privacy that *exists*, and that is acknowledged to be *reasonable*." (Emphasis in original.)). Given that the language of the Fourth Amendment applies to both "searches" and "seizure," and the fact that this case turns on the reasonableness of the officer's entry, we need not detain ourselves drawing precise lines between the two concepts.

authority as an occupant"); *see also Rodriguez*, 497 US at 181 ("The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects."); *Coolidge*, 403 US at 468 (even if the police are certain that a home contains contraband, the Court "has repeatedly stated and enforced the basic rule that the police may not enter and make a warrantless seizure").

Thus, the dispositive issue, for purposes of the Fourth Amendment, is not whether this case involved a "seizure" rather than "search," but instead whether the warrantless, physical intrusion into defendant's home was reasonable based on the consent of defendant's co-occupant—consent that was given after defendant had been arrested and, so the state argues, when defendant was no longer "present and objecting." The answer to that question depends on how one reads the holding in *Randolph*.

Since *Randolph*, three federal circuits have split on the issue before us. In *United States v. Murphy*, 516 F3d 1117 (9th Cir 2008), police encountered the defendant at the entrance to a storage facility unit in which he was living. They knew the defendant to be a methamphetamine user, were able to observe an operating methamphetamine lab in the unit, and arrested the defendant. They sought the defendant's consent to search the unit, but he refused. The police then sought and obtained the consent of Roper, a third party who rented the storage facility and had permitted the defendant to live there. Based on Roper's consent, the police searched the unit and seized the lab. The defendant moved to suppress the evidence that derived from the search, and the trial court denied the motion. After *Randolph* was decided, the defendant unsuccessfully petitioned the trial court to reconsider its earlier ruling. 516 F3d at 1119-20.

On appeal, the government attempted to distinguish *Randolph* on the ground that, because the defendant had been arrested, "the objecting co-tenant was not physically present when the other tenant gave consent to the search." 516 F3d at 1124. The Ninth Circuit rejected that argument, seeing no reason "why [the defendant's] arrest should vitiate the objection he had already registered to the search." *Id.* Thus, the court "h[e]ld that when a co-tenant objects to a

search and another party with common authority subsequently gives consent to that search in the absence of the first co-tenant the search is invalid as to the objecting co-tenant." *Id.*

The court found support for that holding in "the *Randolph* Court's treatment of the related issue of police removal of a tenant from the scene for the purpose of *preventing* him from objecting to a search." 516 F3d at 1124 (emphasis in original). "If the police cannot prevent a co-tenant from objecting to a search through arrest, surely they cannot arrest a co-tenant and then seek to ignore an objection he has already made." *Id.* at 1124-25. The court further held:

> "Nor, more generally, do we see any reason to limit the *Randolph* rule to an objecting tenant's removal by police. Once a co-tenant has registered his objection, his refusal to grant consent remains effective barring some objective manifestation that he has changed his position and no longer objects. The rule that *Randolph* establishes is that when one co-tenant objects and the other consents, a valid search may occur only with respect to the consenting tenant. It is true that the consent of either co-tenant may be sufficient in the absence of an objection by the other, either because he simply fails to object or because he is not present to do so. *Nevertheless, when an objection has been made by either tenant prior to the officers' entry, the search is not valid as to him and no evidence seized may be used against him.*"

*Id.* at 1125 (emphasis added). Thus, the court reversed the denial of the defendant's motion to suppress.

The Seventh and Eighth Circuits, however, have understood *Randolph* differently. In *United States v. Henderson*, 536 F3d 776, 779 (7th Cir 2008), *cert den*, 130 S Ct 59 (2009), the "sole issue on appeal [was] whether *Randolph* requires exclusion of evidence obtained in a warrantless search of a home after a present and objecting occupant is arrested and removed from the home and a co-occupant with authority consents to the search." The defendant, relying on the Ninth Circuit's reasoning in *Murphy*, argued that his subsequent arrest did not vitiate his earlier objection to a search. The case, the court acknowledged, was "materially indistinguishable" from *Murphy*; nevertheless, the court held that the search was valid. *Henderson*, 536 F3d at 783.

The Seventh Circuit's decision in *Henderson* took a narrow view of *Randolph*, confining it to the "indispensible" predicate of "the contemporaneous presence of the objecting and consenting cotenants." 536 F3d at 783. The continuing "presence" of the objecting co-occupant, in the Seventh Circuit's view, "plays a vital role in the *Randolph* majority's 'social expectations' premise; a third party, attuned to societal customs regarding shared premises, would not, '[w]ithout some very good reason,' enter when faced with a disputed invitation between cotenants." *Id.* (quoting *Randolph*, 547 US at 113). However, "[t]he calculus shifts," the court explained, "when the tenant seeking to deny entry is no longer present." *Id.* At that point,

> "[h]is objection loses its force because he is not there to enforce it, or perhaps (if we understand the Court's rationale correctly) because the affront to his authority to assert or waive his privacy interest is no longer an issue. As between two present but disagreeing residents with authority, the tie goes to the objector; police may not search based on the consent of one in the face of 'a physically present inhabitant's express refusal of consent' to search. [*Randolph*, 547 US at 122.] We do not read *Randolph* as vesting the objector with an absolute veto; nothing in the majority opinion suggests the Court was creating a rule of continuing objection."

*Henderson*, 536 F3d at 783-84.

The court also relied on the "limiting effect of Justice Breyer's concurrence on the scope of the majority opinion." *Id.* Justice Breyer joined the majority opinion in *Randolph* but also wrote separately to explain his understanding that the majority opinion was "case-specific" and "does not apply where the objector is not present 'and object[ing].'" *Randolph*, 547 US at 126-27 (Breyer, J., concurring). In the Seventh Circuit's view, "[t]hat [concurrence], and the specific limiting language in the majority opinion itself, convince us that *Randolph*'s holding ought not be extended beyond the circumstances at issue there." *Henderson*, 536 F3d at 784. For that reason, the Seventh Circuit rejected the reasoning in *Murphy* and instead followed the lead of the Eighth Circuit, which had earlier held that, after an objecting co-occupant has been arrested and removed from the scene, there is no

longer a valid objection by a "present" occupant for purposes of *Randolph*. *Id.* (citing *United States v. Hudspeth*, 518 F3d 954 (8th Cir 2008)).

The facts in this case, for purposes of our analysis, do not differ in key respects from *Murphy*, *Henderson*, or *Hudspeth*. Here, as in those cases, police asked defendant for consent to search his home. He refused, and police then arrested him and removed him from the premises. They subsequently sought, and obtained, consent to enter the home from defendant's co-occupant, for the purpose of seizing evidence in the home. Thus, the question for us—an intermediate state court bound neither by the Ninth Circuit nor by other federal circuits—is which of the courts has the better understanding of *Randolph* and its underpinnings. That is, does the "calculus shift" regarding reasonableness once the objecting tenant is arrested and removed from the scene, as the Seventh and Eighth Circuits reasoned? Or is it the case, as the Ninth Circuit held, "that when a co-tenant objects to a search and another party with common authority subsequently gives consent to that search in the absence of the first co-tenant the search is invalid as to the objecting co-tenant"? *Murphy*, 516 F3d at 1124.

In discerning the merits of the competing views, we find it most helpful to return to the underlying principle that drove the Court's opinion in *Randolph*: Sanctity of the home is the rule, and co-occupant consent the exception. Indeed, *Randolph*'s analysis begins with the core tenet of Fourth Amendment law that, ordinarily, "warrantless entry of a person's house [is] unreasonable *per se.*" *Randolph*, 547 US at 109. *Matlock* and *Rodriguez* notwithstanding, co-occupant consent is not itself the default, but is instead a " 'jealously and carefully drawn' *exception*" to the ordinary rule against warrantless entry. 547 US at 109 (quoting *Jones*, 357 US at 499) (emphasis added).

Bearing in mind that construct, *Randolph* is best viewed not as an "exception" to co-occupant consent cases like *Matlock* and *Rodriguez*, but rather as an illustration of the ordinary rule that warrantless searches are unauthorized. That is, *Randolph* is properly understood as a case in which the Court was unable to find, as it had in *Matlock* and

*Rodriguez*, an exception to the warrant requirement. In determining whether the circumstances merited a departure from the ordinary rule, the Court explained that the "constant element" in assessing whether a warrantless entry is reasonable based on the co-occupant's consent is "the great significance given to widely shared social expectations." 547 US at 111. The Court ultimately concluded that police cannot reasonably rely on a co-occupant's consent in the face of an express, "at-the-door" objection, because there is ordinarily "no societal understanding of superior and inferior" as between the rights of co-occupants. 547 US at 114. Such is the case, according to the Court, "whether the issue is the color of the curtains or invitations to outsiders." *Id.*

Thus, the question before us is whether some *different* societal understanding obtains once the objecting tenant has been arrested. That is, does it somehow become "reasonable" under the Fourth Amendment for police to ignore a tenant's earlier objection once that tenant is arrested? We are not persuaded that it does.

To begin with, the state has not identified any readily analogous fact pattern that convinces us that, once a present and objecting co-occupant is no longer at the door of the dwelling, social expectations immediately shift such that the unwelcome visitor would then be expected to enter notwithstanding the earlier "at-the-door" objection. Indeed, as the dissenting opinion pointed out in *Henderson*, that approach entails something of a Hobbesian view of the world: that social expectations extend only so far as one is able to physically and presently enforce them. 536 F3d at 787 (Rovner, J., dissenting). We do not find that view to be a particularly convincing ground on which to depart from the premise in *Randolph* that, "when people living together disagree over the use of their common quarters, a resolution must come through voluntary accommodation." 547 US at 113-14.[6]

---

[6] The difficulty in identifying "widely shared social expectations" in any given situation was one of the bases for dissent set forth by Chief Justice Roberts:

"The possible scenarios are limitless, and slight variations in the fact pattern yield vastly different expectations about whether the invitee might be expected to enter or to go away. Such shifting expectations are not a promising foundation on which to ground a constitutional rule, particularly because the majority has no support for its basic assumption—that an invited guest

Moreover, considering that consent is a " 'jealously and carefully drawn' exception" to the prohibition on warrantless entry, we are disinclined to resolve doubt regarding social expectations in favor of the state.

Echoing *Henderson*, the state emphasizes the general social understanding—exemplified in *Matlock* and *Rodriguez* and recognized in *Randolph*—"that any [co-occupant] may admit visitors, with the consequence that a guest obnoxious to one may nevertheless be admitted *in his absence* by another." *Randolph*, 547 US at 111 (emphasis added). However, the social understanding described in those cases concerned not only an "absent" co-occupant, but also the absence of *any objection*. In fact, *Randolph* expressly rejected the view that *Matlock* purported to say anything about the circumstance in which an occupant has explicitly objected to entry. *Id.* at 121.

There is a fundamental difference between the *Matlock/Rodriguez* situation and the circumstances presented here. In the *absence of any objection*, as in *Matlock* and *Rodriguez*, police are justified in relying on the assumption that any joint tenant typically has the right to permit inspection. *Randolph*, 547 US at 111. The same is not true, however, once the police meet with an objection by an occupant who is physically present. At that point, the objection takes on primary importance under *Randolph*, and the question becomes whether "customary social understanding accords the consenting tenant authority powerful enough *to prevail over the co-tenant's objection.*" *Id.* at 121. For the reasons stated earlier, the state has not persuaded us that any "customary social understanding" is powerful enough under these circumstances to disturb the ordinary rule that police must obtain a warrant before entering a person's dwelling for the purpose of obtaining evidence.

We acknowledge that, as the state correctly points out, the majority in *Randolph* (as well as Justice Breyer's concurrence) appears to go out of its way to emphasize the narrowness of the Court's holding and the continuing viability of *Matlock* and *Rodriguez*. At the same time, nothing in

---

encountering two disagreeing co-occupants would flee—beyond a hunch about how people would typically act in an atypical situation."

547 US at 130 (Roberts, C. J., dissenting).

the Court's opinion (or even in the concurring or dissenting opinions) even hints that a different result would have obtained had Mr. Randolph been arrested immediately after his objection; indeed, the majority opinion identified a number of ways in which "society can * * * have the benefit of [the consenting co-occupant's and the state's] interests without relying on a theory of consent that ignores an inhabitant's refusal to allow a warrantless search"—including the co-occupant delivering evidence to police, or the police obtaining a warrant based on information provided by the co-occupant. *Id.* at 116-17. The Court also explained that, in the course of requesting consent, the officers might discover an exigency that would permit their entry. *Id.* at 116 n 6. But at no point did the Court suggest that, in addition to those means of protecting the co-occupant's rights, police had the option of simply arresting the defendant and then seeking the co-occupant's consent—something of a glaring omission, given the potential significance of that exception and the depth of treatment given to other hypothetical fact patterns.[7]

In sum, we are unable to find any "recognized authority" that one co-occupant might have to admit police over the then-present objection of the other occupant, whether or not the objecting occupant is subsequently arrested at the scene. And in the absence of such "recognized authority," "a police officer [has] no better claim to reasonableness in entering than the officer would have in the absence of any consent at all." *Id.* at 114. Accordingly, we hold that the police entry into defendant's home was unconstitutional, and that the trial court erred in denying defendant's motion to suppress.

Reversed and remanded.

---

[7] The state also suggests that the scope of the entry was sufficiently limited— obtaining guns that Hanscomb herself could have delivered to police—so as to be "reasonable" under the totality of the circumstances. The fact that Hanscomb herself could have delivered the evidence does not justify an exception to the warrant requirement. Although the officers articulated general safety concerns about Hanscomb delivering firearms, there is no evidence that they suspected Hanscomb to pose an officer safety threat or that they feared that she would hide or destroy evidence in the house, in the event that they were to obtain a warrant.